UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Kathryn McNelis                                  Civil No. 04-1494 (DSD/FLN)

       Plaintiff,

   v.                                          **REPORT AND RECOMMENDATION**

Jo Anne B. Barnhart,
Commissioner of Social Security,

       Defendant.

_____

Jennifer G. Mrozik, Esq., for Plaintiff.
Lonnie F. Bryan, Assistant United States Attorney, for Defendant.

_____

Plaintiff Kathryn McNelis seeks judicial review of the final decision of the Commissioner of Social Security, who denied her application for disability insurance benefits ("DIB"). See 42 U.S.C. §§ 416(i) and 423. The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1(c). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). The parties have submitted cross-motions for summary judgment [#9 and #12]. For the reasons that follow, this Court recommends that the Commissioner's decision be affirmed.

## I. INTRODUCTION

Plaintiff Kathryn R. McNelis applied for DIB on August 25, 1999, alleging a disability onset date of January 20, 1997. (Tr. 16, 59). Her date of last insured was June 30, 1998. (Tr. 16). Therefore, to prove eligibility for DIB, McNelis had to establish she became disabled on or before

this date.  (See Pl. Mem. p. 1).[1]

In her application for DIB, McNelis alleged the following impairments:  severe neuropathic pain relating to nerve damage in her face, chronic pain syndrome, migraine headaches, anxiety, dysthymia, and a personality disorder. (Tr. 159, 200, 323, 595).  The Social Security Administration denied the application initially and on reconsideration.  (Tr. 29-31, 36-37).  McNelis timely filed a request for a hearing, which was held before the Administrative Law Judge ("ALJ") Michael D. Quayle on April 10, 2002.  (Tr. 16, 23, 39).  McNelis was represented by attorney James Greeman at the hearing.

The ALJ rendered an unfavorable decision on May 15, 2002.  (Tr. 13).  He determined that McNelis had the residual functional capacity ("RFC") to perform light exertional level tasks with some limitation.  (Tr. 23).  The ALJ found that McNelis could perform her past relevant work as a cashier as she had previously performed it.  (Tr. 22).  The ALJ therefore concluded that McNelis had not been disabled under the Social Security Act as of June 30, 1998, and was not eligible for DIB. (Id.).  McNelis appealed this decision to the Appeals Council, which denied review on February 13, 2004, making the decision of the ALJ the final decision of the Commissioner.  (Tr. 6-12).

McNelis initiated this action seeking judicial review on April 7, 2004.  [#1].  She moved for Summary Judgment on August 25, 2004 [#9], seeking to have the Commissioner's decision denying her DIB reversed.  The government moved for Summary Judgment on October 12, 2004 [#12], arguing that the Commissioner's decision was proper and should be affirmed.  McNelis raises the following issues in her motion:  1) whether the ALJ conducted a proper credibility analysis; 2)

---

[1]

McNelis also filed an application for Supplemental Security Insurance ("SSI") under Title II of the Social Security Act. It was denied for excessive resources, and is the subject of a separate appeal.  (Tr. 702-703).  In this action, McNelis challenges only the denial of her DIB application.

whether the ALJ properly developed the record as to limitations stemming from McNelis' use of medication; and 3) whether the ALJ should have obtained testimony from a qualified medical expert.

## II.  STATEMENT OF FACTS

### A.    Background

Plaintiff Kathryn McNelis was born on August 20, 1974.  She was age 23 at the time her eligibility for DIB expired, and was age 27 at the time of the final administrative hearing.  (Tr. 702). She graduated from high school and has completed some class work at the community college level. She is single and has no children.  (Tr. 704).  She worked in the past as a cashier at a dry cleaner and car wash.  (Tr. 84).

### B.    Medical Evidence

#### 1.     Jaw Infection and Hospitalizations

McNelis has a history of chronic facial and jaw pain, which stems from an endodontic root canal procedure she underwent in November 1996.  (Tr. 154).  On January 17, 1997, she reported to the hospital with severe facial pain.  She was treated medically with Toradol and Percocet.  (Tr. 153).

On February 25, 1997, McNelis was admitted to Methodist Hospital as a result of the facial pain.  (Tr. 154).  Dr. Dean Tsukayama diagnosed mandibular osteomyelitis.[2]  Dr. Lehnart performed a debridement[3] on February 27, 1997.  (Id.).  He discovered that during her root canal in November 1996, the endodontist had removed an inch of artery and nerve from McNelis' jaw.  (Tr. 525).

---

[2]

Mandibular osteomyelitis is an inflammation of the lower jaw bone caused by a pus-producing organism.  Dorland's Illustrated Medical Dictionary 984, 1201, 1394 (28th ed. 1994).

[3]

A debridement is the removal of contaminated tissue adjacent to an infection.  Dorland's Illustrated Medical Dictionary 430 (28th ed. 1994).

Cultures from the surgery indicated a severe infection in her jaw, and McNelis remained hospitalized and underwent intravenous antibiotic therapy. Dr. Tsukayama reported that McNelis suffered "considerable problem with pain management during this hospitalization." (T. 155). To aid with pain management, he obtained a consult from psychiatrist Susan Czapiewski, MD, who was able to suggest a pain regimen that enabled McNelis to satisfactorily control the pain. (Id.). McNelis was discharged on March 7, 1997. Dr. Lehnert prescribed 90mg of Oromorph, and 40mg of Prozac, to be taken daily, and Vicodin, to be taken as needed. (Tr. 164).

On April 15, 1997, Dr. Lehnart attempted a nerve graft in the affected area. The surgery was unsuccessful because he could find no viable nerve. (Tr. 169; 525).

On July 1, 1997, McNelis was again admitted to Methodist Hospital due to facial pain. (Tr. 168). Dr. Tsukyama ordered an MRI of her left jaw. The MRI showed no frank abscess or large area of infection. (Tr. 169). McNelis was prescribed several additional pain-relieving medications, including Naprosyn, Gabapentin, and self-administered morphine. (Tr. 168).

## 2.    Ongoing Pain Management and Diagnosis of Chronic Pain Syndrome

The record shows that upon release from the hospital, McNelis continued with a pain management program supervised by Dr. Czapiewski and nurse practitioner Barbara St. Marie at Park Nicollet Medical Center. (Tr. 171). Additionally, McNelis underwent periodic medical evaluations by physicians at the Park Nicollet clinic.

On October 13, 1997, McNelis saw Dr. Czapiewski for a routine pain management consultation. At that time, McNelis was taking 200mg of OxyContin[4] a day. (T. 175). Dr. Czapiewski noted that McNelis had some slurred speech, but was relaxed and alert, and did not

---

[4]

OxyContin contains oxycodone, a very strong narcotic pain reliever similar to morphine.

appear overly sedated.  (Tr. 173).  McNelis reported that she was not having any trouble concentrating and felt well enough to return to work.

On December 18, 1997, McNelis saw the the nurse practitioner, Barbara St. Marie, for a scheduled pain and medication consultation.  (T. 171).  McNelis reported that she continued to have pain, but that she was "70% better," and that her "quality of life was 60% better."  She stated that she was looking for a job and felt the quality of her life would improve if she were to return to work.

On January 5, 1998, McNelis was examined by Dr. Frederick Taylor at Park Nicollet.  (T. 288-90).  McNelis reported feeling somewhat improved, but that she was experiencing side effects from her medications.  (Tr. 289).  Dr. Taylor found her jaw fully functional, and diagnosed McNelis as suffering from chronic pain syndrome.  He concluded she had "a predisposition to pain based on [her] history of various pains in the lumbar to cervical regions without at least obvious precipitating factors."  (Id.).

Three days later, on January 8, 1998, McNelis told St. Marie that her pain was worse and her jaw was tender to light touch.  (Tr. 287).  St. Marie increased her OxyContin dosage to 260mg daily. On January 14, 1998, McNelis reported feeling depressed, and stated that though she was "bored at home," she was having difficulty motivating herself.  (Tr. 285).  She stated that she was looking for bookkeeping work.  Dr. Czapiewski diagnosed her with depression, recurrent pain, over-sedation from diazepam, and adjustment issues.  (Id.).  On January 22, 1998, McNelis indicated to St. Marie, N.P., that the control of her pain was excellent, that her pain control was better than ever, and that she expected to seek employment contingent upon her car being repaired.  (Tr. 284).  On February 20, 1998, McNelis told St. Marie that she was able to concentrate and felt more focused, and that she was looking for a job that would not require her to talk much.  (T. 282).

-5-

Later that day, McNelis was hospitalized at Methodist Hospital for respiratory distress arising from a possible latex allergy. (T. 198). Upon her discharge two days later on February 22, 1998, Dr. William Rosenberg listed McNelis' daily medications for the treatment of her facial pain, anxiety, and depression[5] as follows: 260mg of OxyContin; 60mg of Roxicodone; 40mg of Prozac; 600mg of Neurontin; 25mg of Nortriptyline; 1500mg of Disalcid; and 3mg of Ativan. (Tr. 197).

On March 9, 1998, McNelis indicated to Dr. Stuart Hanson that her condition was improving through therapy, and that the facial pain was "manageable." (Tr. 278). On March 10, 1998, Dr. Czapiewski noted that McNelis had "few concerns about what she [had] been through and that her mood [was] quite good." (Tr. 277). On April 9, 1998, McNelis stated to psychologist Jane Kilgriff of Park Nicollet Medical Center that her pain remained substantial but that she planned to seek employment in the summer. (Tr. 273).

On May 12, 1998, McNelis reported to Dr. Czapiewski that she was experiencing nausea-inducing headaches, and that she had been waking up in panics, and that on several days per week she was unable to sleep at all. (Tr. 502). Nevertheless, she indicated that she did not feel depressed, but rather was hopeful. Dr. Czapiewski expressed some concern about the amount of medication McNelis was taking, and opined that she needed to develop "skills in order to be in control." (Tr. 503).

On May 15, 1998, McNelis was referred to Dr. David Schultz, a physician specializing in pain management. (Tr. 675). McNelis characterized her pain to Dr. Schultz as constant; and reported that it gave rise to fatigue, sleeplessness, depression, and anxiety. She indicated that physical activity, including coughing, sneezing, and eating, exacerbated the pain, but that

---

[5]

The record shows that McNelis had experienced depressive episodes since 1991. (See Tr. 591).

"distraction and relaxation" relieved the pain to some degree.  (Id.).  She reported that she was not

suffering from headaches, nausea, or general malaise.  (Tr. 676).  At the time of her examination,

she was taking 600 mg of Neurontin, 40 mg of Prozac, 280 mg of OxyContin, 20 mg of Roxicodone,

and 3mg of Lorazepam daily.  (Tr. 675-76).  Dr. Schultz observed that McNelis was alert, speaking

clearly and articulately, and had a pleasant affect.  (Tr. 676).

On May 19, 1998, McNelis stated during her examination by Dr. Birnbaum at Park Nicollet

that the control of her pain was "fair," but that her continuing pain rated a six or seven on a scale of

ten.  (Tr. 266).  She indicated at that time that she was trying to exercise more.  (Tr. 267).

Dr. Schultz performed two nerve blocks in February 1999.[6]  (Tr. 418-20; 339; 673-74).

McNelis reported that the second nerve block increased her pain.  (Tr. 336).  He concluded that

McNelis suffered from complex chronic pain with physical and psycho-social aspects (Tr. 418).  He

expressed concern at the large doses of opiates that she was taking, but she informed him that she

experienced no side effects from the drugs.  (Id.).  Dr. Schultz reported that McNelis appeared

"awake and alert, with normal mental status," and that she "was completely coherent and logical."

At Dr. Czapiewski's referral, McNelis was examined by Matthew Monsein, M.D., at the

Abbott Northwestern Chronic Pain Rehabilitation Program in May 1999.  Dr. Monsein noted that

during the exam, McNelis was alert and oriented.  He found that her head and neck revealed marked

hypersensitivity to light touch, but that the remainder of her neurologic examination was completely

---

[6]

The Court notes that much of the medical evidence in the record postdates June 30, 1998, the date on which McNelis insured status lapsed.  Medical evidence from a time subsequent to a certain period is relevant, however, to a determination of a claimant's condition during that period.  Halvorsen v. Heckler, 743 F.2d 1221, 1225 (7th Cir.1984).  Thus, it is error for an ALJ to simply ignore evidence that post-dates the insured period.  The ALJ must consider evidence that post-dates the relevant period to the extent that it corroborates or supports the evidence from the relevant period.

benign.  (Tr. 414-17).

At Dr. Czapiewski's request, social worker Ms. Marcia Justice, assessed McNelis on January 18, 2000.  (Tr. 486-89).  McNelis reported feeling less depressed, although she napped 16-18 hours a day.  (Tr. 486).  Ms. Justice found that she was alert and oriented, but tearful and anxious.  Her judgment was good, but her insight was fair, and she was completely focused on her pain.  She diagnosed her with moderate recurrent depression, and chronic pain syndrome with anxiety.  She gave McNelis a score of 50-55 on the Global Assessment of Functioning ("GAF")[7] scale, indicating moderate symptoms.  (Tr. 487).

### 3.    Treating Physician, Dr. Rimando

In January 2000, McNelis began seeing Dr. Rimando, a specialist in physical medicine and rehabilitation at Park Nicollet, for pain management.  (Tr. 402; 514).  On January 10, 2000, he found that she appeared in no acute distress, that there were no dystrophic changes noted about the face or neck, no abnormalities around the joints, no TMJ click or swelling, and that her cranial nerve was intact.  (Tr. 402).  On February 7, 2000, McNelis reported to Dr. Rimando that her pain was under control.  (Tr. 399).  On June 22, 2000, Dr. Rimando stated that McNelis had no physical limitations, but that pain limited her activities of daily living.  (Tr. 390).  On August 24, 2000, Dr. Rimando noted that McNelis was not exhibiting any pain behavior.  (Tr. 378).

Throughout his treatment of McNelis, Dr. Rimando continually increased her medication. In September 2000, she was taking 1280mg of OxyContin a day.  (Tr. 372-80).  In November 2000, Dr. Rimando noted that McNelis was healthy and in no acute distress, but that she had trouble

---

[7]

GAF is a scale used by treating professionals to express a judgment of an individual's level of functioning for the purposes of planning future treatment.  Diagnostic and Statistical Manual of Mental Disorders 30-32 (4th Ed. 1997).

sleeping, and found talking and eating painful. (Tr. 456). He gave her a series of exercises to build her upper body strength. He increased her medication again in March 2001. (Tr. 448). In May 2001, McNelis reported that the acupuncture treatments she received produced some relief, and that she suffered no side effects from her medication. (Tr. 441). By March 2002, Dr. Rimando had increased her OxyContin to 2000mg a day, and had prescribed liquid morphine for breakthrough pain. (Tr. 600).

On March 27, 2002, Dr. Rimando completed a medical assessment of McNelis' physical and mental ability to do work-related activities. (Tr. 681-85). He opined that McNelis' physical impairments did not affect her ability to lift, carry, stand, walk, sit, reach, handle, feel, push, pull, see, or hear. (Tr. 681-84). He reported that she could frequently climb, kneel, and crawl, but because of her pain medications, she could only occasionally balance, stoop and crouch. (Tr. 683). He noted that her facial pain affected her speaking ability, and that extremes in temperature could aggravate her facial pain. (Tr. 684).

Regarding McNelis' mental ability, he opined that she had the ability to follow work rules, use judgment, and interact with supervisors was more than satisfactory, and that she could satisfactorily function independently, understand, remember, behave in an emotionally stable manner, relate predictably in social situations, demonstrate reliability, and carry out complex and detailed work instructions. (Id.).

### 4.    Consultative Examinations

In May of 2000, Dr. Khurshed Ansari conducted a Physical Residual Functional Capacity Assessment of McNelis, pursuant to her claim for Social Security benefits. (Tr. 347-54). Dr. Ansari opined that McNelis was capable of occasionally lifting up to 20 pounds, and standing or walking

up to six hours per work day, and that she had no postural, visual, manipulative, communicative, or environmental limitations.  (Tr. 348-51).

At the same time, Dr. Thomas Kuhlman completed a psychological assessment of McNelis pursuant to her application for DIB.  (Tr. 355-57).  Dr. Kuhlman concluded that McNelis had only slight to moderate limitations.  (Tr. 355-57, 368).

On January 29, 2002, psychologist Carole Selin, Ph.D, conducted a psychological evaluation of McNelis.[8]  (Tr. 588-99).  During the examination, McNelis indicated that she regularly made bullets for her father's gun, participated in trap shooting once per month, cleaned guns, played solitaire, watched TV, used the Internet, cared for her dog, helped with cooking, talked with a friend, managed her own finances, and performed light chores around the house.  (Tr. 592-93).  Dr. Selin diagnosed Ms McNelis as having a personality disorder due to "chronic social and job problems," and an anxiety disorder.  (Tr. 596).

Dr. Selin gave McNelis a GAF score of 60, which indicated moderate symptoms.  (Tr. 595). Dr. Selin opined that McNelis could generally remember and carry out complex and detailed instructions, and make simple work-related decisions.  (Tr. 597-98).  She found that there was a slight impairment in McNelis' ability to respond to work pressures and interact with supervisors and the public, but that she could nonetheless function satisfactorily in those areas.  (Tr. 598-99).  She noted that dependence on pain medications could affect McNelis' ability to complete work in a timely manner.  (Tr. 599).

--------

[8]

McNelis administrative hearing was originally scheduled on January 7, 2002, before ALJ Quayle.  On that date, ALJ Quayle continued the hearing so that McNelis could obtain a mental status exam.  The ALJ stated that the record had not been adequately developed regarding McNelis' psychological impairments.  (Tr. 693).  Dr. Selin performed the requested psychological evaluation on January 29, 2002.

## C.      McNelis' Application for DIB

In April of 2000, McNelis completed an "Activities of Daily Living Questionnaire" as part of her application for DIB.  (Tr. 92-97).  At that time, McNelis indicated that she typically slept 16 hours a day, groomed and dressed herself, watched TV, talked on the phone with friends, and cleaned the kitchen.  She walked her dog on a weekly basis.  On a monthly basis she shopped, went out socially, drove, cooked, and visited friends or family.  She listed her hobbies as reading and playing card games.  She noted she had no fear of groups or of going out in public.  She indicated that, "due to pain and medications," she had difficulty working, performing yard work and heavy cleaning, and holding long conversations.  She also indicated that she was slow in reading, talking, and thinking.

## D.      McNelis' Testimony

At the administrative hearing on April 10, 2002, McNelis testified to her impairments and conditions.  (Tr. 701-29).  She stated that she lived with her parents, did not have a current driver's license, and that her doctors had advised her not to drive.  (Tr. 704).  She last worked as a cashier at a car wash in January of 1997.  (Tr. 705).  She testified that she quit that job because of the nerve damage in her face, which caused pain and required medication.  (Tr. 706).

She testified that she took numerous prescription medications, including 4800mg per day of OxyContin.[9]  Her attorney argued that the record, which contained a 50-page prescription profile that detailed the 45 different medications that had been prescribed to her since 1997 (Tr. 534-582), showed that McNelis' medications have been continually increased to try to manage her pain.  (Tr.

---

[9]

In June 1998, the month in which her DIB eligibility expired, she had been taking 280mg of OxyContin a day.  (See Tr. 675).

710).  He stated that the medications substantially slowed her pace and affected her ability to concentrate.  (Tr. 711).  McNelis stated that she had an inconsistent sleeping pattern as a result of her medications.  (Tr. 709).  McNelis testified that despite the numerous medications, she still experienced recurrent pain that was exacerbated by talking, eating, and exposure to wind or extreme temperatures.  (Tr. 723-24).

McNelis then described her typical day.  She noted that she often slept more than 18 hours a day, but that at times she could not sleep for two days because of her pain.  (Tr. 724-25).  During her waking hours, she watched television with her family and ate food prepared by her parents.  She bathed approximately once per week, and stated that contact with water and shampooing her hair aggravated her pain.  She indicated that she was in constant pain that never dropped below seven on a pain scale of one to ten.  (Tr. 726).

### E.    Vocational Expert Testimony

Juletta Harren testified as a Vocational Expert at the hearing.  (Tr. 698).  The ALJ asked Ms. Harren to consider an individual who had the ability to lift twenty pounds occasionally and ten pounds frequently, and the ability to stand or sit for six hours.  The individual had no push, pull, postural, manipulative, visual, communicative, or environmental restrictions, but was psychologically limited to brief and superficial contact with the public, supervisors, and co-workers, and needed a low stress job with routine tasks that required only three to four step instructions.  (Tr. 729).  Ms. Harren concluded that, with the limitations set forth by the ALJ, McNelis was able to perform her past work as a cashier at the dry cleaners.  (Tr. 730).

The ALJ then asked whether Ms. Harren had ever placed an individual in a job that was taking as many narcotics as McNelis was then taking.

| ALJ: | Have you ever place[d] anybody, Ms. Harren, that's taking that much narcotics? |
| Ms. Harren: | Not that — |
| ALJ: | Have you ever encountered anybody that's taking that much narcotics that's functioning? |
| Ms. Harren: | Not in my— |
| ALJ: | Moving around? |
| Ms. Harren: | —no in my recent memory. |

(Tr. 731).

F.     **The ALJ's Decision**

In determining whether McNelis was disabled, the ALJ followed the five-step sequential process outlined in 20 C.F.R. § 404.1520.  In the first step of the analysis, the ALJ determined that McNelis had not engaged in any substantial gainful activity after the alleged onset date of January 20, 1997.  (Tr. 17).

In the second step of the evaluation process, the ALJ determined that McNelis suffered from the following severe impairments: chronic facial pain, a history of migraine headaches, dysthymia, an anxiety disorder, and a personality disorder.  (Id.).

In the third step, the ALJ compared McNelis' severe impairments with the Listing of Impairments in Appendix 1 to Subpart P of the Regulations.  According to the Regulations, if the required level of conditions is met, the claimant is found to be disabled without further consideration of vocational factors.  20 C.F.R. § 404.1520(a)(4)(iii).  The ALJ concluded that McNelis did not have an impairment or combination of impairments that were medically equivalent to those in the Listing of Impairments.  (Id.).

At the fourth and fifth steps of the evaluative process, the ALJ determined whether McNelis' RFC permits her to perform her past relevant work or any other work existing in significant numbers in the national economy.  The ALJ determined that McNelis had the RFC to complete light work

as defined in 20 C.F.R. § 404.1567(b). The ALJ found:

> [T]he claimaint retains the [RFC] to perform light work; with lifting
> 20 pounds occasionally, and 10 pounds frequently; standing or
> walking 6 hours out of an 8 hour day; sitting 6 hours out of an 8 hour
> day; performing work that is low stress and routine in nature, with 3
> to 4 step simple instructions; involving only brief and superficial
> contact with co-workers, supervisors, and the public.

(Tr. 18). The ALJ noted that McNelis' RFC had been duly reduced to account for her severe

physical and mental impairments, including the side effects of her medications. (Tr. 18, 22).

The ALJ concluded that McNelis could perform her past relevant work as a cashier as she

had previously performed it. (Tr. 22). As a result, the ALJ found that Ms.McNelis was not disabled,

as defined in the Social Security Act, at any time relevant to the adjudication.

### III.  STANDARD OF REVIEW

Judicial review of the final decision of the Commissioner is restricted to a determination of

whether the decision is supported by substantial evidence on the record as a whole. See 42 U.S.C.

§ 405(g);  Collins ex rel. Williams v. Barnhart, 335 F.3d 726, 729 (8th Cir. 2003); Qualls v. Apfel,

158 F.3d 425, 427 (8th Cir. 1998). Substantial evidence is less than a preponderance and means

such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Gowell v. Apfel, 242 F.3d 793, 796 (8th Cir. 2001); Black v. Apfel, 143 F.3d 383, 385 (8th Cir.

1998). In determining whether evidence is substantial, a court must also consider whatever is in the

record that detracts from the Commissioner's decision. Tucker v. Barnhart, 363 F.3d 781, 783 (8th

Cir. 2004); see also Cruse v. Bowen, 867 F.2d 1183, 1184 (8th Cir. 1989) (citing Universal Camera

Corp. v. N.L.R.B., 340 U.S. 474, 488 (1951)).

A court, however, may not reverse merely because substantial evidence might support a

different conclusion. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000); Gaddis v. Chater, 76

F.3d 893, 895 (8th Cir. 1996).  Therefore, this Court's review of the ALJ's factual determinations is deferential, and the Court may not substitute its own view of the evidence for that of the Commissioner.  Kelley v. Barnhart, 372 F.3d 958, 960 (8th Cir. 2004).

Here, McNelis only seeks review of the ALJ's decision denying her DIB; she does not seek review regarding Social Security Income.  To establish eligibility for DIB, McNelis had to prove she became disabled before June 30, 1998, her date of last insured.  The Court must therefore consider whether substantial evidence from January 20, 1997, the alleged onset of disability, to June 30, 1998, the date of last insured supports the ALJ's denial of DIB.  See Social Security Act, §§ 216(i); 223, as amended, 42 U.S.C.A. §§ 416(i); 423.

## IV.  CONCLUSIONS OF LAW

### A.    The ALJ Conducted a Proper Credibility Analysis.

After consideration of the record, including McNelis' testimony, the ALJ concluded that McNelis retained the ability to perform light work.  Although the ALJ found that McNelis was subject to severe impairments, he did not find her contention that her impairments prevented her from working to be credible.  (Tr. 18).  The ALJ rejected her contention of total disability because the medical evidence failed to provide "strong support" for McNelis' claim and because of "inconsistencies in the record as a whole."  (Tr. 18-19).

McNelis argues that the ALJ failed to properly analyze her subjective complaints pursuant to Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). When measuring credibility, Polaski counsels the ALJ to give full consideration to all the evidence relating to subjective complaints of disabling pain, including such evidence as the claimant's regular activities, the intensity and frequency of the pain, aggravating factors, dosages and side effects of medication, and other

functional restrictions.  Polaski, 739 F.2d at 1322.  McNelis argues that the ALJ failed to properly assess the credibility of her subjective allegation of complete disability because he failed to adequately consider the side effects of her medications.

The ALJ's credibility finding is entitled to considerable deference.  See e.g., Johnson v. Chater, 87 F.3d 1015, 1018 (8th Cir. 1996) (holding that a court may not substitute its opinion of the plaintiff's credibility for that of the ALJ).  If subjective testimony is inconsistent with the record as a whole, the ALJ may discount it.  Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); Polaski, 739 F.2d at 1322.  It is not necessary for the ALJ to explicitly discuss each Polaski factor, but if an ALJ rejects a claimant's testimony, he must make an express credibility determination explaining the reasons for not believing the testimony.  Brown v. Chater, 87 F.3d 963, 965 (8th Cir. 1996); Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

In his decision the ALJ referred to a number of inconsistencies between McNelis' allegation of total disability and the evidence of record.  (Tr. 19-22).  In particular, the ALJ noted 1) that the objective medical evidence supported the RFC determination and was inconsistent with McNelis' allegation of disability; 2) that the medical opinions in the record did not support a total inability to work; 3) that McNelis' daily activities during the period of eligibility for DIB did not support her allegation; and 4) that McNelis' earning history before the alleged onset of disability reflected a lack of desire or need for full-time employment.

The ALJ concluded that the objective medical evidence and the medical opinion evidence demonstrated that McNelis could perform light work.  (Tr. 19).  The ALJ noted that the MRI in July 1997 showed no frank abscess, or large area of infection, and that McNelis was diagnosed with chronic pain syndrome in October 1997.  In December 1997, the nurse practitioner, Barbara St.

Marie, reported that McNelis' mood was good, she had no difficulty with energy, alertness, or concentration, and that McNelis felt well enough to return to work.  (Id.).

The ALJ also referenced Dr. Taylor's examination of McNelis in January 1998, in which Dr. Taylor found that she had no significant TMJ dysfunction, and that except for her reported decreased sensation in the lower jaw on the left side, her examination was normal.  Dr. Taylor opined that McNelis suffered from chronic pain syndrome and a predisposition to pain.  The ALJ noted that later that month, McNelis reported to St. Marie, N.P., that she was feeling better than ever, with solid pain control.  (Id.).

The ALJ noted that McNelis reported to Dr. Czapiewski, on January 14, 1998, that she was having problems with motivation but that she was looking for a bookkeeping position.  On January 22, 1998, McNelis reported to St. Marie, N.P., that she felt better than ever, with solid pain control. When she saw St. Marie, N.P., in May 1999, she reported doing quite well, and that she was exercising frequently, and socializing more.  (Id.).

The ALJ noted that in May 1999, Dr. Monsein's examination of Plaintiff revealed marked hypersensitivity to light touch over the lower jaw region, but that the remainder of the neurological examination was completely benign.  (Tr. 20).

When Dr. Rimando examined McNelis on January 10, 2000, he indicated she was in no acute distress, and that there were no dystrophic changes around the face and neck, no abnormalities around the joints, no oral swelling, no TMJ click, and a normal cranial nerve examination.  (Id.). The ALJ also noted that when McNelis saw Dr. Rimando in February and August 2000, he reported that she exhibited no pain behavior.

The ALJ also took into account that Dr. Schultz' notation in February 1999, that with

-17-

distraction technique, no tenderness or hypersensitivity could be elicited in McNelis' facial sensation; and that Ms. Justice and Dr. Selin opined that McNelis had GAF scores of 50-60, which indicated only moderate symptoms. (Tr. 20-21).

The ALJ gave considerable weight to the opinions of the consultative professionals who evaluated McNelis on three separate occasions pursuant to her application for Social Security benefits. (Tr. 347-57, 586-99, 679-85). Doctors Ansari, Selin and Rimando concluded that she was capable of performing light work with only light to moderate limitations. In his examination of McNelis on March 27, 2002, Dr. Rimando expressly noted the effects of her medications. He opined that the narcotics she took could affect her attention and ability to tolerate work stress, but in every other regard, he found her mental ability to be good or very good. (Tr. 683). In reaching his RFC determination, the ALJ gave considerable weight to the opinions of the consultative professionals who reviewed the record and opined that McNelis was capable of light work. (Tr. 21).

The ALJ explicitly noted that McNelis took a number of different medications to treat her impairments, and that the "medical record documents concerns from her treating physicians that she is addicted to some of them." (Tr. 22; 479). Accordingly, the ALJ "reduced [McNelis' RFC] capacity to accommodate side effects from her medications," but he did "not find that the record documents that her medication side effects significantly affect her functioning." (Tr. 22).

The ALJ found that the effects of McNelis' impairments were not consistent with total disability, but were consistent with her ability to perform light work activities. The medical evidence supports the ALJ's determination that McNelis' subjective allegations of total disability are not credible. See Polaski, 739 F.2d at 1322 (the absence of an objective medical basis that supports the degree of severity of subjective complaints alleged is one factor to be considered in

evaluating the credibility of the testimony and complaints).  Moreover, the evidence in the medical records, as noted by the ALJ, reflects McNelis' own statements to her treating professionals that her chronic pain was not debilitating, that she was able to engage in physical activity despite the pain, and that she felt well enough to seek and perform work.  (See Tr. 19-21, 171, 173, 267, 273, 278, 284).  Accordingly, the ALJ properly concluded that the objective medical evidence and the medical opinions in the record, supported some degree of limitation, but not a determination of complete disability.

The ALJ also properly found that McNelis' daily activities were inconsistent with her allegations of total disability, but were fully consistent with a finding that she could perform light work.  (Tr. 21).  The ALJ noted that McNelis reported in conjunction with her application for DIB in 2000 and 2002 that she regularly groomed and bathed herself, took care of her dog, went to movies and out to eat, cleaned, drove, cooked, and shopped.  During the psychological examination with Dr. Selin, she stated that she makes bullets and goes trap shooting with her father, cleans guns, plays cards, listens to music, uses the computer, buys groceries, and irons shirts.  (T. 21-22; 591-92).  As the ALJ noted, the record indicates that McNelis was at least periodically quite active, and that on numerous occasions, she indicated she felt capable of working.

Finally, in evaluating McNelis' allegations of complete disability, the ALJ considered her work history.  He noted that her earnings record documents that she earned $5,219 in 1995, and $15,824 in 1996, with "earnings prior to that indicative of only minimal part time work."  (Tr. 22; 62-64).  The ALJ found that McNelis earnings record indicated either a lack of interest or need for full time employment.

The Court finds that the ALJ properly rejected McNelis' allegation of total disability.  She

argues, however, that the pain she experiences on a daily basis precludes her from engaging in substantial gainful employment.  She argues that even if her high level of OxyContin medication affords her some relief, the effects of the narcotic preclude her from gainful employment.  See Pl. Mem. p. 11.  McNelis asserts that a physician has never implied that she malingers or exhibits drug-seeking behavior.  See Id. p. 10.  The ALJ, however, never asserted that Ms. Ms McNelis malingers; nor did he ignore her medication records.  Instead, he specifically took into account the amount of narcotics McNelis takes on a daily basis, and limited her RFC to low-stress, routine work that involved only superficial contact with others.

Given the inconsistencies between McNelis' allegations and the evidence of record, namely the objective medical evidence, the opinion evidence, her daily activities, and her work history, the ALJ properly rejected her complaint of disability.  If an ALJ discredits testimony and explicitly gives good reasons for doing so, a court is bound by that judgment unless it is not supported by substantial evidence on the record as a whole.  Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992).  The ALJ complied with the requirements in Polaski for assessing McNelis' subjective allegations by pointing out substantial inconsistencies in the record.  The ALJ met  his duty to consider and articulate his credibility finding.  Substantial evidence supports the ALJ's determination that McNelis' allegations of disability were not wholly credible.

**B.      The ALJ Sufficiently Developed the Record Regarding the Side Effects of McNelis' Medications.**

McNelis next argues that the ALJ failed to properly develop the record regarding the side effects from her medications on her ability to work.  Although the claimant has the burden of proving the existence of a disability, the ALJ has a "duty to develop the record fully and fairly" in determining whether and to what extent a claimant has the residual functional capacity to perform

work. Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992); Snead v. Barnhart, 360 F.3d 834, 836-37 (8th Cir. 2004). This duty includes the responsibility of ensuring that the record includes evidence from a treating physician, or at least an examining physician, addressing the particular impairments at issue. Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000) (holding it was improper for the ALJ to rely on the opinions of reviewing physicians alone). The duty to fully develop the record, however, arises only if a crucial issue is undeveloped. Stormo v. Barnhart, 377 F.3d 801, 805 (8th Cir. 2004). McNelis suggests that the ALJ failed to develop the record regarding how her medications affect her ability to work. The Court disagrees, and finds the record was sufficiently developed regarding the effect of McNelis' medications.

McNelis relies principally on Cox v. Apfel, 160 F.3d 1203 (8th Cir. 1998), to support her argument. In Cox, the Eighth Circuit directed the district court to remand the case to the Commissioner of Social Security so that an ALJ could properly develop the record with regard to the effects of substantial pain medications on the claimant's ability to work. Id. at 1210. In that case, the ALJ did not address the effects of the claimant's medicine in his opinion, did not ask questions regarding the effects of the medicine during the hearing, ignored indications in the record that the effects of the medicine could impact the claimant's ability to work, and did not seek to fill in substantial gaps in the claimant's medical records. Id. at 1209. The court in Cox held that the deficiencies in the development of the record rendered the ALJ's ultimate decision unsupported by substantial evidence. Id. at 1210 ("[S]ince the record clearly did not contain enough evidence to adduce the impact of Cox's morphine dependence on her ability to work, . . . the ALJ's failure to develop the record more fully is reversible error.").

The facts of the instant case are substantially different from those in Cox. The Court notes

at the outset that the transcript contains over 600 pages of medical records of McNelis' treatment from 1997 to 2002.  McNelis does not allege that the record is missing any specific records.  The transcript includes records from numerous medical doctors, psychiatrists, and psychologists. Though the record shows that McNelis takes astonishing amounts of narcotics, none of the treating or consultive physicians opined that her condition or medications rendered her unable to do any work.  Both Dr. Selin, the consultative psychologist, and Dr. Rimando, the treating pain management specialist, found that she had the physical and mental ability to do work-related activities.  (T. 21).  Their opinions are consistent with the ALJ's RFC determination that she is capable of a range of light work.

Additionally, unlike in Cox, McNelis testified at length regarding her medications and their resulting effects.  (See Tr. 715-29).  She stated that her medication caused sedation and hindered her ability to concentrate.  (Tr. 724).  The ALJ explicitly accounted for these side effects in his determination of her RFC.  Specifically, he noted that McNelis reported taking "a number of different medications to treat the symptoms resulting from her impairments [Tr. 142-152], and the medical record documents concerns from her treating physicians that she is addicted to some of them [Tr. 478-79]."  The ALJ accordingly reduced her RFC "to accommodate side effects from her medications."  (T. 22).  Specifically, the ALJ limited the RFC to permit only low stress work, routine in nature, with 3 to 4 step simple instructions that involved only brief and superficial contact with co-workers, supervisors and the public.  (T. 18).  The ALJ explicitly rejected McNelis' claim that her medication side effects significantly affected her functioning.  (T. 22).

The Court finds that the record was adequately developed regarding the side effects McNelis experienced from her medications.  While an ALJ has the duty to develop the record, the burden of

persuasion to prove disability and to demonstrate RFC remains on the claimant.  Snead, 360 F.3d

834, 838 (8th Cir. 2004).  Here, the issue before the ALJ was not whether she experienced side

effects from her medications, but rather how severe her symptoms were, and how those symptoms

affected her.  Here, no crucial issue was left undeveloped; rather, McNelis simply failed to show that

the side effects from her medications prevented her from being able to perform her past work.  See

Kisling v. Chater, 105 F.3d 1255, 1257 n. 3 (8th Cir. 1997) ("The record itself, however, is

sufficiently developed; the documents and testimony simply fail to support Kisling's claims").


**C.**    **The ALJ Was Not Required to Call A Medical Expert to Testify.**

McNelis finally argues that the ALJ should have called a medical expert to testify as to

McNelis' impairments at her hearing.  She argues that because approximately 300 pages of medical

records (Tr. 370-685) were added to the administrative record after the state agency physicians

examined her in May 2000, the ALJ was required to call a medical expert to testify on the entire

record.

McNelis relies on Social Security Ruling 96-6p to support her argument.  That Ruling

requires an ALJ to seek an updated medical opinion from a medical expert, in addition to that which

is on the record, when additional medical evidence has been received that might change the findings

contained in a state agency's judgment on whether the claimant is disabled.

An ALJ's duty to obtain an updated medical expert opinion is triggered only when the ALJ

reasonably believes that he has received additional medical evidence that might change the state

agency physician's opinion.  McNelis claims that the additional records document a worsening of

her pain and a systematic increase in her pain medication.  See Pl. Mem. p. 14.  She argues that the

records may change the medical expert's findings or suggest that her impairments are equivalent in severity to any impairment in the Listing of Impairments. Id. p. 16. The Court disagrees, and finds that the ALJ had no reason to believe that the additional medical evidence would likely alter the consultative physician's opinion.

First, the evidence was not relevant to the ALJ's determination whether McNelis became disabled before June 30, 1998, her date of last insured. All but twelve pages of the additional pages of evidence post-date June 30, 1998.[10] McNelis fails to demonstrate how the additional evidence relates back to her period of DIB eligibility. Her allegation that the additional evidence demonstrates that her condition had deteriorated since June 30, 1998, indicates that the evidence does not relate back. The evidence, therefore, cannot support her application for DIB, and was not likely to change the state physician's opinion.

Second, the opinions from McNelis' treating and examining physicians contained in the additional evidence are consistent with the state agency physicians' opinions. The ALJ expressly noted that Dr. Selin's psychological opinion was fully consistent with his opinion as to McNelis' RFC. (T. 21). Dr. Selin formulated her opinion only after she reviewed the very evidence that McNelis complains the ALJ ignored. (Tr. 588-89). Similarly, the assessment in March 2002, by Dr. Rimando, the doctor who prescribed most of McNelis' pain medication, fully coincided with the earlier opinion of Dr. Ansari, and the ALJ's determination that she was capable of a range of light work. See Tr. 18-211; 347-69; 679-85.

The medical records that were made part of the administrative record after the state

---

[10]

The twelve pages that does pre-date the expiration of her insured status - treatment notes from Dr. Tsukayama, Dr. Czapiewski, and St. Marie, N.P., (Tr. 502-13) - is duplicative of other evidence from these practioners.

physicians examined McNelis post-dated her DIB eligibility period.  Moreover, McNelis fails to show how the medical evidence in the records were likely to change the State agency consultant's finding that her impairments were not equal in severity to any impairment in the Listing of Impairments.  Instead, the records support and corroborate the consultative opinions.  The ALJ committed no error when he relied on the State Agency physicians without obtaining an additional medical expert opinion.

## V.  RECOMMENDATION

Based on all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.  Plaintiff's Motion for Summary Judgment [#9] be **DENIED**;

2.  Defendant's Motion for Summary Judgment [#12] be **GRANTED**.

DATED: July 15, 2005                              s/ *Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge

Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **August 2, 2005**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to ten pages. A judge shall make a de novo determination of those portions to which objection is made.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.